The **GRAIN VALLEY AIRPORT CORPORATION**, Appellant,

v.

Charles A. **RILEY**, Respondent.

No. 30156.

Missouri Court of Appeals,
Western District.

Oct. 29, 1979.

---

R. T. Brewster, Kansas City, for appellant.

Gene P. Graham, Independence, for respondent.

Before SOMERVILLE, P. J., and PRITCHARD and MANFORD, JJ.

MANFORD, Judge.

This is an equity action in trespass. The relief prayed for was an injunction. This direct appeal is from the trial court judgment.

Review of this cause is made pursuant to *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976); *Mitchell v. Atherton*, 563 S.W.2d 13 (Mo. banc 1978); *State ex rel. Sageser v. Ledbetter*, 559 S.W.2d 230 (Mo.App.1977); *Farm Bureau Mut. Ins. Co. v. Broadie*, 558 S.W.2d 751 (Mo.App.1977) and Rule 73.01.

Two points are presented on this appeal, both alleging error by the trial court for entry of judgment against appellant upon the sole contention that the judgment is against the weight of the evidence. Both points are taken up together as they allege the same error.

Appellant, under its petition, alleged certain specific acts of negligence by respondent, notice to desist from such acts, notice to respondent that he was prohibited from using appellant's airport facilities and respondent's repeated use of those facilities after the notice of prohibition, the latter of which allegedly gave rise to trespass by respondent.

The petition sought an injunction against respondent in restraint of the use of appellant's airport in the future.

The pertinent facts are summarized below.

Appellant is a private corporation duly authorized to operate an airport within Jackson County. The corporation has a board of directors and officers authorized by the stockholders to conduct the business of the corporation. The airport consists of two runways, hangars, directional equipment and a communications system referred to as a Unicon. The airport does not contain a flight or control tower facility. An airport which does not contain this kind of facility is known as an uncontrolled airport.

Since this case is reviewed under Rule 73.01, the facts in issue must be reiterated herein. A summary of appellant's evidence is presented, followed by a summary of respondent's evidence.

## APPELLANT'S EVIDENCE

Appellant called five witnesses to testify relative to the allegations of appellant.

The first witness, Leonard J. Specht, testified to specific alleged negligent acts by respondent. Mr. Specht testified that on July 17, 1976, at about 5:00 p. m., respondent "made a low pass" (100–150 feet) above the active runway and "laid smoke" on the runway over and in the pathway of other aircraft then on the runway. The other aircraft were in a "rolling motion" on the runway.[1] The record shows this date

---

1. Rolling motion is a phrase used on the record to indicate aircraft on the ground but moving on the runway for purposes of takeoff from the runway.

was a day of a Chapter 91 Experimental Show, commonly referred to as a "fly in".[2]

Witness Specht further testified that in January of 1977, while operating a grader to remove snow from the runway, he (Specht) saw the respondent, Mr. Riley, (who did not attempt to get Specht's attention) land his employer's aircraft in such a manner as to cause a hazard to the grader and the aircraft flown by respondent. Mr. Specht further testified that on July 10, 1977, the respondent taxied his aircraft in such a manner as to blow sand, rock and dust into hangars in the area. He stated that respondent made a takeoff some 100–150 feet from a runway intersection. A takeoff at the intersection was prohibited by airport rules. The evidence was in conflict as to whether the rules on this matter and others were ever posted or otherwise made known to airport users. Mr. Specht further stated that respondent tested the engine of his aircraft, a practice commonly referred to as a "run up" of the engine, in such a manner as to cause "prop wash". This is where the wind from the propeller flows across an active runway. The evidence on this point showed that during such operation, no aircraft made any takeoff or landing from or off of the runway where the "prop wash" was passing over. There was conflicting testimony as to how far respondent's plane was from the actual runway, what the acceptable practice of run up was and what the effective distance of the "prop wash" was regarding potential dangers or possible damage to any aircraft which might have crossed the "prop wash" while using the runway.

Appellant called witness William Bradford, (a stockholder of appellant corporation) who was at the trial. He testified that on one occasion, he was in the process of landing a Tri Pacer Piper Club aircraft when a twin engine Cessna 310 crossed in front of his aircraft.[3] This caused Mr. Bradford to divert the direction of his aircraft and he ended up in a grassy area off the runway. The evidence showed the Cessna to be on a final landing approach and further, the Tri Pacer did not have its radio on during this occurrence.

Appellant called as a witness Dewey Ballard. The record shows Mr. Ballard to be an expert on aircraft configuration and on flying procedures. His testimony consisted of proper aircraft approach and landing procedures, safety procedures and response to hypothetical questions on these points.

Witness Harold Herman was called by appellant. Mr. Herman testified having seen respondent's private aircraft (a modified North American SNJ-5 and also referred to as a T/6) make a low pass in June or July, 1976 and that the aircraft laid smoke on the runway. His testimony was that the aircraft was some 8 to 10 feet off the runway and there were other aircraft in a "rolling motion" on the runway.

Appellant also called Joe Brant as a witness and the record shows this witness was an expert on propeller-type aircraft, including the type of aircraft owned (SNJ-5 or T/6) by respondent and the aircraft operated by respondent for his employer (Cessna 310). Witness Brant was asked and did testify as to "prop wash" or propeller blast and the procedure for a "run up"[4] of an aircraft engine. His testimony further consisted of the proper approach procedures into an uncontrolled airport.

## RESPONDENT'S EVIDENCE

Respondent called as his first witness John Hamilton. This witness operated a flying school at the airport. He testified that it was a common occurrence for pilots to taxi in and out of hangars and this was really a matter of individual pilot conduct. It was this witness who, the morning of the

---

2. The record shows that when a "fly in" is in progress, the airport is closed to regular air traffic.

3. The record shows the Cessna aircraft to be owned by the Bratten Corporation. The chief pilot is the respondent.

4. As previously defined, "run up" indicates a procedure where an aircraft engine is tested prior to takeoff. In the record, the "run ups" were made to test the magneto performance on the aircraft operated by respondent.

"grader incident" testified that he talked with respondent about 1½ hours before the incident by telephone. Respondent called from Peoria, Illinois and asked this witness about the weather at appellant's airport. Mr. Hamilton testified he alerted respondent to the fact that the grader was clearing snow from the runway. He testified he observed respondent approach the airport, make a proper pattern, (attempting to get the attention of the grader operator) and then make his final landing. He stated he had never heard any complaints from other pilots about respondent's flying. He said that at 100 feet there would be no damage from "prop wash" from an SNJ–5 or T/6 aircraft. He also testified that during "fly in" events, a lot of pilots make low passes and some drop smoke. He concluded by testifying respondent was one of the safest pilots making use of appellant's airport.

Respondent then called Roger Lane, who testified he knew of no posted rules at the airport and that he, along with others, had been criticized by the airport management for taking off at the runway intersection.

Witness Mike Powis was called. He testified he was very familiar with the aircraft owned by respondent. He stated the aircraft had, from the pilot's location, an unobstructed 360° visibility.

There had been, in appellant's evidence, the alleged failure to use drip pans for aircraft in the hangars. Witness Powis stated he had been in most of the hangars in appellant's airport and at those times did not observe drip pans. Mr. Powis further testified he had never observed any posted rules on engine "run up" and had never observed respondent or anyone else creating a hazard to other aircraft, although respondent and others (including Mr. Powis) had "run up" engines in such location that "prop wash" extended onto the active runway. He also testified there were no posted rules on the running of engines in hangars, but that he had seen others running engines in hangars. Mr. Powis had never observed respondent lay any smoke which came down onto the runway.

Respondent then called witness Walter Frey. Mr. Frey, at this time, was on the Board of Directors of appellant corporation. He testified the corporation did not authorize Mr. Specht to proceed with this action against respondent. The corporate by-laws and minute records of appellant corporation were introduced into evidence, however, and they reflect the authorization of a $38.00 expenditure as the filing fee for the commencement of this action. Mr. Frey further testified he attended "nearly every board meeting" and on one such occasion, he entered a motion to prevent the filing of this suit. However, such motion failed.

Respondent's evidence concluded with testimony of the respondent. He testified he operated a twin engine Cessna 310 for his employer and owned a SNJ–5 or T/6 aircraft, both of which he flew in and out of appellant's airport. He further testified the trouble between him and appellant appeared to start after he took up rental of another hangar. He had previously been renting a hangar from witness Specht. Apparently, there is or was, at this time, other litigation pending between the parties. The record is not clear as to the details of this litigation.

Respondent testified that on the day of the "fly in" he did make passes over the runway, but that other aircraft did the same thing. He further testified that his private aircraft, the SNJ–5 or T/6, was equipped with a smoke device which had been installed and its operation had been approved by authorities from the F.A.A. He also testified that at no time did he release any smoke while any other aircraft was on the runway. He said he knew of no posted or formal rules regarding the taxi of aircraft into and out of hangars and that others had done so at appellant's airport.

As to the occurrence of the "run up", he testified his aircraft has a 360° visibility from the pilots location and that he maintained a constant lookout for other aircraft during this operation. He stated at no time did any other aircraft make use of the runway.

As regards the grader incident, respondent testified he called from Peoria, Illinois and talked with witness Hamilton about the weather. Mr. Hamilton advised respondent of the grader activity. Respondent testified he approached the airport and made the proper approach pattern for purposes of alerting the grader operator or in getting his attention. He then made his landing and in his opinion, did not come into such close proximity of the grader as to create any hazard.[5]

Respondent then testified that he and witness Specht had a confrontation over this landing and respondent asked Specht repeatedly what type approach he should have made on landing with the grader in operation. Respondent testified that Specht's explanation of landing procedures under such conditions were exactly what respondent did at the time. According to respondent, Specht accused him of making a "straight in" landing. Upon the confrontation, respondent told Specht he did not make a "straight in" landing but that he followed the procedure authorized by Specht. Upon this assertion, Specht shrugged his shoulders and walked away.

Regarding the alleged incident involving the aircraft operated by Mr. Bradford, respondent stated his landing approach was in conformance with F.A.A. regulations regarding landing approach.

Thus, at the close of the evidence and upon entry of judgment for respondent, the court made findings of fact. The court concluded appellant was a duly organized corporation and that Leonard J. Specht was the General Manager of the airport and was a person authorized to institute the instant proceedings. The court further found the by-laws of appellant corporation authorized the stockholders to rent hangar space to whomever they desired without prior permission or approval by the corporation. The court found that at all times respondent was entitled to the lawful use of appellant's airport and its facilities. The court also found the evidence and proper inferences therefrom failed to establish respondent operated his aircraft in a negligent manner by making a low pass over the runway on July 17, 1977; and that the evidence did not establish respondent operated his aircraft in a negligent manner in January, 1977 relative to the clearing of snow from appellant's runway by grader equipment. The court further concluded the evidence did not establish respondent was negligent in the operation and taxi of his aircraft in relation to the airport hangars, that respondent was not negligent in his failure to use a drip pan under his aircraft while in the hangar; that the respondent was not negligent concerning the incident involving the aircraft operated by Mr. Bradford (Tri Pacer Piper Club), rather, the situation was a combination of events including the status of appellant's airport as an uncontrolled airport and the fact that Mr. Bradford did not have his radio on at the time.

The court concluded, by declaring there was no evidence to show there were properly enacted and published rules of the airport at the time of the alleged incidents and the apparent rules relied upon by users, including respondent, were those promulgated by the F.A.A.

It is to be noted there was no evidence in the record that anyone made any complaint or alleged any flying irregularity by respondent to the Federal Aviation Administration or any other official regulatory body.

Upon consideration of the record, and as must be done in giving due deference to the trial court in its position to listen to and observe the demeanor of the witnesses, this court finds the record herein contains substantial evidence to support the judgment; that said judgment is not against the weight of the evidence and that the trial court did not erroneously declare or erroneously apply the law to the facts. Hence, under the rules of *Murphy v. Carron, supra, Mitchell v. Atherton, supra, State ex rel.*

---

5. It appeared from respondent's evidence the grader in question was off the runway but appellant's evidence placed the grader and the aircraft within 30–35 feet distance of each other.

*Sageser v. Ledbetter, supra, Farm Bureau Mutual Ins. Co. v. Broadie, supra* and Rule 73.01, the judgment herein is in all respects affirmed.

All concur.